**FILED**
JUL 23 2008
7-23-08
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT

NORTHERN _____ DISTRICT OF ___ILLINOIS, EASTERN DIVISION___

UNITED STATES OF AMERICA

v.

RODERICK MOORE, aka "Skee," "Skeet"

(Name and Address of Defendant)

**CRIMINAL COMPLAINT**

MAGISTRATE JUDGE MASON

CASE NUMBER:

**08 CR  584**

I, <u>Fernando Cervantes</u>, being duly sworn state the following is true and correct to the best of my knowledge and belief. Starting no later than in or around <u>June 2007</u>, and continuing until August 23, 2007, at Chicago, in <u>Cook</u> County, in the <u>Northern</u> District of <u>Illinois</u> defendant(s) did, (Track Statutory Language of Offense)

knowingly and intentionally distribute controlled substances, namely, 50 grams or more of mixtures and substances containing cocaine base in the form of crack cocaine, and a quantity of substances containing cocaine, both Schedule II Narcotic Drug Controlled Substances,

in violation of Title __21__ United States Code, Section(s) __841(a)__.

I further state that I am a(n)____Special Agent, Drug Enforcement Administration____ and that this complaint is based on the following facts:
<span style="font-size:smaller">Official Title</span>

See Attached Affidavit

Continued on the attached sheet and made a part hereof:   _X_ Yes    ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

July 23, 2008                                    at    Chicago, Illinois
Date                                                   City and State

Hon. Michael T. Mason, U.S. Magistrate Judge           _____
Name & Title of Judicial Officer                       Signature of Judicial Officer

| | |
|---|---|
| STATE OF ILLINOIS | ) |
| | ) SS |
| COUNTY OF COOK | ) |

## AFFIDAVIT

I, FERNANDO CERVANTES, having been duly sworn, state as follows:

### I.   PURPOSE OF THE AFFIDAVIT

1. I am employed as a Special Agent of the United States Department of Justice, Drug Enforcement Administration (DEA), and have been so employed since June 2004. I am currently assigned to the Chicago Division of the DEA and work on a Consolidated Priority Organization Target (CPOT) Group. From July 2005 through June 2008 I worked in a High Intensity Drug Trafficking Area (HIDTA) group tasked to investigate street gangs and other criminal enterprises in and around Chicago. As such, I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. My official DEA duties include investigating criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841, 843, 846 and 848. I have received special training in the enforcement of laws concerning controlled substances as found in Title 21 of the United States Code.

3. In my law enforcement career, I have participated in numerous investigations related to the illegal distribution of controlled substances and other violations of the narcotics laws of the United States. I have received special training in the enforcement of laws concerning controlled substances, and I have been involved in various types of electronic surveillance and the debriefing of defendants, witnesses, informants, gang members, and others who have knowledge of the illegal

distribution and transportation of controlled substances. I have been trained and developed expertise in complex narcotics investigations, and several of those investigations have resulted in the seizures of controlled substances, including cocaine, cocaine base, marijuana and heroin. Many of those investigations also generated multi-jurisdictional and international narcotics cases, and led to the arrest of dozens of defendants. I have personally prepared and sworn to numerous affidavits for search warrants, arrest warrants, and court-authorized wire intercepts. I have arrested numerous defendants and testified in court based upon evidence developed and seized during the investigations in which I have participated. I have also acted in an undercover capacity many times in my law enforcement career.

4. The information contained in this Affidavit is based on my personal knowledge, physical surveillances, interviews of a cooperating defendant, reviews of consensually-recorded conversations and videotaped surveillances, interviews of other law enforcement officers and/or reviews of their reports, and reviews of witness statements and lab reports, among other things. This Affidavit is being submitted for the limited purpose of establishing probable cause to support a criminal complaint charging RODERICK MOORE (aka "Skeet" & "Skee") with possession with the intent to distribute and the distribution of controlled substances, namely in excess of 50 grams of mixtures and substances containing cocaine base in the form of crack cocaine, and mixtures and substances containing cocaine, in violation of Title 21, United States Code, Section 841(a)(1). Accordingly, I have not included each and every fact known to me concerning this investigation.

## II. PROBABLE CAUSE

### A. Information received from Cooperating Defendant (CD-1) Regarding the Narcotics Trafficking of RODERICK MOORE

5. In early June 2007, a Trooper from the Illinois State Police conducted a traffic stop of an individual (the "driver") driving a car on Interstate 80 in Illinois. After approaching the driver's vehicle, the Trooper detected a strong smell of marijuana emanating from it. The Trooper called the Frankfort Police Department (FPD) K-9 unit, which was dispatched to the site of the traffic stop. The FPD narcotics-detection dog alerted to the interior and the trunk of the vehicle, indicating that the dog detected the presence of narcotics there.

6. Based on the alert of the FPD narcotics-detection dog, the Trooper and other officers then searched the vehicle and found approximately 260 grams of white substances, which was field tested and indicated positively for the presence of cocaine, along with suspect marijuana.[1] In addition, approximately $326 was also seized from the driver.

7. Following this narcotics seizure, the driver was read his *Miranda* rights and agreed to waive them both orally and in writing. The driver then admitted that he was a cocaine dealer operating in the Springfield, Illinois area, and that he regularly purchased powder and crack cocaine from an individual known to him only as "Skee," usually two times per month.[2] The driver stated that "Skee" lives near the area of 11617 South Yale in Chicago, Illinois. The driver further stated that earlier in the day (June 5, 2007), he had called "Skee" and ordered cocaine and crack cocaine

---

[1] Subsequent testing by the DEA North Central Laboratory confirmed that the suspected narcotics consisted of approximately 127.9 grams of cocaine base, 123.4 grams of cocaine hydrochloride, and 0.46 grams of marijuana. In addition, the packaging from these drugs was submitted for fingerprint analysis, but no prints suitable for comparison were recovered.

[2] The driver later identified "Skee" from a photo array, and "Skee" was found to be RODERICK MOORE.

from "Skee." The driver reported that he had driven to the area of 11617 South Yale, met with "Skee," and paid him $5,800 for approximately 260 grams of powder and crack cocaine, which were the drugs recovered inside his vehicle.

8. After making these admissions, the driver, hereinafter Cooperating Defendant 1 ("CD-1") agreed to cooperate with law enforcement in the hopes of receiving consideration in the charging and sentencing decisions that would be made regarding the narcotics that were recovered from him that day. [3]

### B. June 28, 2007 -- CD-1's Controlled Purchase of Cocaine and Crack Cocaine From RODERICK MOORE ( aka "Skeet" & "Skee")

9. On June 28, 2008 at approximately 9:45 a.m., at the direction of ISP agents and other law enforcement officials, CD-1 placed a consensually-recorded telephone call to MOORE to make arrangements for an another narcotics purchase.[4] During the recorded call CD-1 stated, "I should be around there about twelve thirty, somewhere around there. You already know what I'm trying to do right?" (meaning that CD-1 was planning to go to MOORE'S residence in the area of 11617 South Yale, Chicago, Illinois to conduct a narcotics transaction similar to the one conducted on June 5, 2007). "Yep," MOORE responded. CD-1 then stated, "Alright. Well, I need that, you know what I'm saying, like straight up, but you know what I mean?" MOORE replied, "Uh- huh" (meaning that

---

[3] In addition to the June 5, 2007 arrest described above, CD-1's criminal history consists of arrests for manufacture/delivery of cocaine and heroin, possession of marijuana, disorderly conduct, and mob action. Charges in each case were dismissed. Charges against CD-1 for the June 5, 2007 arrest described above were later dismissed on the state's motion with leave to re-instate them at a later date. No promises have been made to CD-1 regarding what charges, if any, may ultimately be brought against him, or what sentence he might receive in exchange for his cooperation. To date, CD-1 has provided reliable information regarding RODERICK MOORE and his narcotics trafficking activities, and CD-1's information has been corroborated by law enforcement.

[4] The quoted material from these calls is drawn from draft, not final, transcripts, and is intended to reflect a summary of the calls described, not the entire call. In addition, interpretations of the calls are based on the Affiant's understanding and interpretation of them as set forth in the parentheses following the calls.

both CD-1 and MOORE understood that CD-1 wanted to purchase both cocaine and crack cocaine from MOORE, as CD-1 had done previously).

10. Before CD-1 left law enforcement agents, they searched him and his car for the presence of cash or illegal contraband, with negative results. Agents provided CD-1 with a recording/transmitting device, and installed a video camera inside his car. In addition, an officer acting in an undercover capacity ("UC-1") accompanied CD-1, posing as his customer. Agents also provided UC-1 $6,000 in undercover funds to pay for the drugs to be purchased from MOORE.

11. Surveillance agents and officers ("surveillance") then relocated to an area near 11617 South Yale with a video recorder, which they used to videotape the ensuing meetings and drug deal. At approximately 11:12 a.m., surveillance saw CD-1 and UC-1 arrive in CD-1's vehicle and park near 11617 South Yale. Surveillance then observed CD-1 get out of the vehicle and walked toward 11617 South Yale, where MOORE was standing in front of the residence, apparently waiting for CD-1. As reflected in the audio and video recording from this meeting, CD-1 said to MOORE, "He said he didn't want it soft, but shit, I told him whatever you got, that how we gonna get it.....I'm like, I didn't.....talk about that exactly.....I didn't know if you had it or not" (meaning that CD-1's customer, UC-1, wanted crack cocaine instead of powder cocaine, but CD-1 told him that they would take whatever MOORE had available). Later in the conversation MOORE said, "That will be, like, half and half" (meaning that he would sell half powder cocaine and half crack cocaine to CD-1 and UC-1 when the drugs were available). CD-1 replied, "Right. That will work. That will work. I know he got his money in the car.....give it to you all when I get back" (meaning that UC-1 had money in CD-1's vehicle and would pay for the drugs once MOORE provided them). CD-1 and MOORE then agreed to complete the narcotics transaction when MOORE called CD-1 and told him

5

that the drugs were available. CD-1 subsequently returned to his car and left the area.

12. At approximately 12:17 p.m., CD-1 received a call from MOORE, who told CD-1 to come back and meet him at the side of the house. Although this call was not recorded, UC-1 overheard both ends of the conversation. Shortly thereafter, CD-1 and UC-1 returned to the area of 11617 South Yale, where surveillance again had set up a video recorder to tape the deal. Surveillance then observed CD-1 get out of his car and enter the gangway at the side of the residence, thereby moving outside the sight of surveillance, while UC-1 remained in the car with the money. The audio recording worn by CD-1 reflects that CD-1 then met with MOORE and stated, "Hey dog. My dude didn't give me any bread.....What you want me to do? I didn't get the bread yet, it's up in the car" (meaning that CD-1's customer, UC-1, would not give him the money before receiving the drugs, but that he nevertheless had the money in CD-1's car). At that point, CD-1 reported that MOORE provided him with four plastic bags containing a white substance. MOORE and CD-1 then left the gangway together, and surveillance observed CD-1 walk back to his vehicle and enter it. Once inside, CD-1 provided UC-1 with the four plastic bags containing a white substance. UC-1 then gave the $6,000 to CD-1 to pay MOORE and told CD-1 to have MOORE come to the vehicle so UC-1 could meet him. CD-1 subsequently got out of the car with the $6,000, met MOORE, and they went back into the gangway out of sight of surveillance, where CD-1 reported that he gave MOORE the money. At that time the recording worn by CD-1 reflects that MOORE said, "I didn't know you all were together, you know what I'm saying?" CD-1 replied, "No, he want, he want, like, holler at you, you know. Cause he want to holler at you. He live here.....That's what I'm trying to say. But if you don't want to holla' at him, it's good" (meaning that MOORE didn't know UC-1 was in the car and CD-1 told him that UC-1 wanted to meet him).

6

MOORE stated, "No, no, I'm cool" (meaning that MOORE was willing to meet with UC-1). Surveillance then saw CD-1 and MOORE walk back to the car.

13. Surveillance next observed MOORE enter the car and sit in the driver's side back passenger seat. CD-1 was in the driver's seat and UC-1 was in the front passenger seat. CD-1 stated, as reflected in the recording from the conversation, "What's up? This my dude right here man.....Shit, I'm gonna call you and let you know." UC-1 asked, "What's your name?" and MOORE replied, "Skeet." During this meeting, MOORE's face was captured on the recording device in the car. UC-1 then told MOORE his name, and CD-1 stated, "I'm gonna let you know when you when get up.....I'll call you tell you everything.....Yeah, we all good man. I know this, I mean we, yeah, I'm gonna hit you man in the next couple of days" (meaning that CD-1 was going to call MOORE in the next couple days to conduct another drug deal). MOORE responded, "That will work." UC-1 then asked, "So, you know, you might be able to connect on something that way too, man? You know what I'm saying?" MOORE replied, "For sure, for sure" (meaning that MOORE would be able to get more narcotics for UC-1 in the near future). MOORE then got out of the car and walked back to the front of the residence at 11617 South Yale, and CD-1 and UC-1 left the area.

14. Following this transaction, agents again searched CD-1 and his car for drugs, money and/or contraband, with negative results. The four plastic bags of suspect narcotics were then sent to the DEA North Central Laboratory for testing, which revealed approximately 125.3 grams of

cocaine base in the form of crack cocaine and 125.1 grams of cocaine hydrochloride.[5] [6]

### C. August 23, 2007 -- UC-1's Controlled Purchase of Cocaine From RODERICK MOORE ( aka "Skeet" & "Skee")

15. Following the June 28, 2007 transaction, UC-1 made a series of recorded calls to MOORE on July 20, August 15, August 22 and August 23, 2007, in an effort to coordinate another narcotics transaction. In one of the recorded calls on August 22, 2007, UC-1 stated, "What's up, man? Let me hook up with you tomorrow" (meaning that UC-1 wanted to buy drugs from MOORE the following day). MOORE asked, "Who this?" and UC-1 gave his name and asked, "Who this?" MOORE replied, "Skeet." UC-1 then stated, "OK.....I'm straight pressed tomorrow. I got to go to the doctor, man, at one-thirty, so we do this, it got to be quick, man. Can't be fucking around shit. What time you talking about?" MOORE replied, "You tell me" (meaning that they were trying to agree on a time to conduct a drug deal the next day). UC-1 stated, "How about.....eleven?" MOORE agreed, and UC-1 promised to call MOORE the following day.

16. On August 23, 2007, shortly before 11 a.m., UC-1 called MOORE and told him that he would be at MOORE'S house shortly. MOORE told UC-1 to call when he was in front of the house. UC-1 was then equipped with a recorder/transmitter and provided $3,500 in undercover funds with which to buy drugs from MOORE. In addition, surveillance was equipped with a video camera, with which they videotaped the ensuing drug deal.

---

[5] I know from my training and experience that crack cocaine is a street term for cocaine base appearing in a chunky, rock-like form that is often yellowish or off-white in color. I know that crack cocaine is made by mixing powder cocaine with another substance, often baking soda or some such additive, and boiling the mixture, thereby converting the powder cocaine (cocaine hydrochloride) into cocaine base. Accordingly, drugs that have been recovered as part of this investigation that have tested positive for cocaine base following laboratory analysis, and that I have personally examined and found to appear in a chunky, rock-like form consistent with crack cocaine, I have labeled herein as crack cocaine.

[6] Fingerprint analysis of these bags has not yet been completed.

8

17. Shortly after, at approximately 10:51 a.m., surveillance observed UC-1 arrive in his car and park near the residence at 11617 S. Yale. Surveillance then observed MOORE walk up to the driver's side of the UC-1's vehicle and ask, "What you need?.....What you want?" UC-1 replied, "Half of the last time......I want four and a half" (meaning that UC-1 wanted four and a half ounces of crack cocaine, which was approximately one half the amount of drugs he and CD-1 bought from MOORE on June 28, 2007).

18. Surveillance then observed MOORE walk away from UC-1's vehicle and head south approximately two houses to the address of 11625 South Yale. Surveillance then watched as MOORE walked to the rear of the house, where they briefly lost sight of him. A few minutes later, surveillance saw MOORE return from the rear of the address and sit on the front porch. Surveillance then saw MOORE put an item into a large plastic drinking cup.

19. Surveillance then observed UC-1 get out of his car and sit down with MOORE on the porch. MOORE handed UC-1 the plastic cup and said, "You all good" (meaning that the drugs were in the plastic cup). UC-1 handed MOORE $3,000 and stated, "Count that. You want to count that?" MOORE said, "It's in there.....Hit [CD-1]" (meaning that MOORE wanted UC-1 to call CD-1). UC-1 replied, "No man. Hit me. Fuck him, man.....You know we all have to get ours, you know what I'm saying? I got to be breaking him off, you know what I'm saying? So come on, hit me. When I hit you, if you ain't right, just say you ain't right" (meaning that UC-1 wanted to cut CD-1 out of any future narcotics transactions and they should conduct any future drug deals between themselves). MOORE stated, "I'm steady running through shit" (meaning that MOORE had a steady supply of drugs and would be able to conduct future deals with UC-1 directly). UC-1 then walked back to his vehicle and left the area.

9

20. As UC-1 drove away, surveillance observed MOORE and an unknown male follow UC-1 in a white Chevrolet Cobalt. MOORE and the male followed UC-1 north on Interstate 57 for a period of time, and then exited the Interstate at 95th Street. Surveillance continued to follow UC-1 to a prearranged location, where UC-1 returned the remaining $500 and the white powdery substance inside the plastic cup that was given to him by MOORE.[7] The suspect narcotics then were sent to the DEA North Central Laboratory for testing, which revealed that they consisted of approximately 126.1 grams of cocaine hydrochloride (powder cocaine).

### III. CONCLUSION

21. Wherefore, Affiant submits that the foregoing evidence summarized in this Affidavit establishes that MOORE distributed controlled substances, namely, in excess of 50 grams of mixtures and substances containing cocaine base in the form of crack cocaine and mixtures and substances containing cocaine hydrochloride, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER YOUR AFFIANT SAYETH NOT.

FERNANDO CERVANTES
Special Agent
Drug Enforcement Administration

SWORN TO AND SUBSCRIBED IN MY
presence this 23rd day of July 2008.

MICHAEL T. MASON
U.S. Magistrate Judge

---

[7] The plastic cup was subsequently tested for fingerprints. Although one print was found that was suitable for comparison, the print did not belong to MOORE or CD-1, or anyone else known to law enforcement.